UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    v.

ANDREW GARNER,

        Defendant.

17-CR-49
DECISION & ORDER

---

On March 2, 2017, Juan Pacheco, Jr., and Andrew Garner were indicted for several drug-related offenses, including various drug sales, maintaining a drug-involved premises, and a conspiracy between them to distribute controlled substances. Docket Item 1. On June 21, 2018, Pacheco pleaded guilty to count one of the indictment, which charged a drug distribution conspiracy. Docket Item 122. Garner chose to go to trial, and Pacheco testified against him. Docket Items 136, 137.

At trial, the jury convicted Garner of count one, a conspiracy to distribute cocaine in violation of 21 U.S.C. § 846. Docket Item 140. More specifically, the jury found that Garner had conspired to distribute less than 500 grams of cocaine. *Id.* The jury acquitted Garner on the six other counts, including the substantive distribution and possession-with-intent-to-distribute offenses. *Id.*

At the close of the government's proof, Garner's attorney made an oral motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29. Docket Item 137. The Court reserved decision on that motion, and on July 27, 2018, after the jury returned its verdict, Garner renewed his Rule 29 motion. Docket Item 148. Garner now

argues that the trial evidence does not support the jury's finding that he was guilty of conspiracy. *Id.* at 7. And this Court agrees.

## **TRIAL EVIDENCE**

Several witnesses testified at Garner's trial, but the government relies on the testimony of Pacheco and his girlfriend, Andrea Hatfield Sparks, to support the conspiracy conviction. Docket Item 152 at 7. Pacheco's testimony is most relevant to the existence of a conspiracy between Garner and Pacheco, and Pacheco testified that he sold cocaine to Garner only three times.

According to Pacheco, the first transaction occurred in May 2016 at his cousin's home after Pacheco let his cousin sample his cocaine. Docket Item 203 at 25-26. Garner also was present and asked "how much [Pacheco] could get"; he then purchased either two or four ounces from Pacheco.[1] *Id.* at 26. Pacheco had never met Garner before, so he required Garner to pay him cash instead of "fronting" him the cocaine.[2] *Id.* at 27. The two exchanged phone numbers for further transactions, but they did not discuss amounts or other details of future transactions. *Id.* at 28.

The second transaction occurred in late June 2016. Garner and Pacheco had begun to spend time together "mostly just to hang out and have a good time." Docket Item 204 at 14. While they were hanging out one day, Pacheco asked Garner "if he

---

[1] During his testimony, Pacheco could not remember exactly how much Garner purchased in this transaction, but he testified that it was within this range.

[2] "Fronting" refers to selling controlled substances to a buyer on credit, with the expectation that the buyer will in turn sell those controlled substances for a profit and then pay the seller for his or her purchase. Essentially, it is a loan to be repaid with sale proceeds.

2

needed anything" and Garner "said he wanted a kilo [of cocaine]." *Id.* at 19. Pacheco "thought he was joking." *Id.* Pacheco asked whether Garner had the cash to purchase that amount of cocaine because he did not believe that Garner had enough money and because he did not trust Garner enough to front him the drugs. *Id.* at 20-22. Garner showed Pacheco the cash, and Pacheco delivered the kilo of cocaine to Garner's home. *Id.* at 22.

The final transaction occurred around late July or early August. Garner told Pacheco that he was ready for more and asked whether Pacheco could "get [him] another one." *Id.* at 25. Pacheco told Garner to call him when he had the money, which Garner did a few hours later. *Id.* at 26. Pacheco took the money, counted it, and then gave Garner the kilo of cocaine. *Id.* at 26.

## **DISCUSSION**

"As a general matter, a defendant challenging the sufficiency of the evidence bears a heavy burden, as the standard of review is exceedingly deferential." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir.2012) (internal citations and quotation marks omitted). The court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 307 (1979). In doing so, it "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor." *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008).

A criminal conspiracy exists when two or more people agree to commit an unlawful act. *See United States v. Praddy*, 725 F.3d 147, 153 (2d Cir. 2013). "The essence of the crime of conspiracy . . . is the agreement to commit one or more

3

unlawful acts." *Id.* (internal quotations and alterations omitted). That means at least two people must engage in the "act of agreeing." *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977) (internal quotations omitted). An agreement to distribute controlled substances, even without any overt act, is sufficient to prove a conspiracy in violation of 21 U.S.C. § 846. *See United States v. Anderson*, 747 F.3d 51, 60 n.7 (2d Cir. 2014).

But an agreement simply to buy and sell drugs is not necessarily a conspiracy. In fact, "the mere purchase and sale of drugs does not, without more, amount to a conspiracy to distribute narcotics." *United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015). "[T]he buyer's agreement to buy from the seller and the seller's agreement to sell to the buyer cannot 'be the conspiracy to distribute, for it has no separate criminal object.'" *United States v. Parker*, 554 F.3d 230, 235 (2d Cir. 2009). Even "[e]vidence that a buyer intends to resell the product instead of personally consuming it does not necessarily establish that the buyer has joined the seller's distribution conspiracy." *United States v. Hawkins*, 547 F.3d 66, 74 (2d Cir. 2008). And this is so even "if the seller is aware of the buyer's intent to resell" because "more is required than mere knowledge of the purpose of a conspiracy." *Id.* A conspiracy to distribute requires an agreement to distribute.

The so-called buyer-seller exception "does not protect either the seller or buyer from a charge they conspired together to transfer drugs if the evidence supports a finding that they shared a conspiratorial purpose to advance *other* transfers." *Parker*, 554 F.3d at 234 (emphasis added). "To be a member of a conspiracy one must, under Judge Learned Hand's classic formulation, 'in some sense promote the illegal venture

4

himself, make it his own, have a stake in its outcome.'" *Id.* (quoting *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir. 1940) (L. Hand, J.)) (internal alterations omitted). In other words, a mere sale is not enough for a conspiracy; there must be an explicit or implicit agreement to do something more.

Whether a buyer-seller relationship amounts to a criminal conspiracy "is a highly fact-specific inquiry into whether the circumstances surrounding a buyer-seller relationship establish an agreement to participate in a distribution conspiracy." *Hawkins*, 547 F.3d at 74. Although the Second Circuit has not listed the factors that might guide that inquiry, it has noted the relevance of factors identified in other circuits: "prolonged cooperation between the parties, a level of mutual trust, standardized dealings, sales on credit ('fronting'), and the quantity of drugs involved." *Id.* (quoting *United States v. Hicks*, 368 F.3d 801, 805 (7th Cir. 2004)). Other factors that might bear on the buyer-seller exception are "whether the buyer sought to advance the conspiracy's interests, whether there was a longstanding relationship between the buyer and seller, whether the buyer performed other duties on behalf of the conspiracy, whether the quantity of drugs purchased suggests intent to redistribute, whether the buyer's profits were shared with members of the conspiracy, and whether the buyer had the physical, financial, or other protection of the conspiracy." *United States v. Faltine*, 2016 WL 1700385, at *3 (E.D.N.Y. Apr. 26, 2016) (citing *United States v. Rojas*, 617 F.3d 669, 675 (2d Cir. 2010)). No single factor is dispositive, and the inquiry remains whether a rational jury could find beyond a reasonable doubt that a defendant agreed to join and participate in the conspiracy. *Hawkins*, 547 F.3d at 74.

Here, the required "highly fact-specific inquiry" reveals that there was no evidence upon which a rational jury could find that Garner and Pacheco agreed about anything other than the sales between them.  At trial, Pacheco referred to Garner as a "customer."  Docket Item 204 at 12.  Other than Garner's asking Pacheco how much he could get and Pacheco's responding "whatever you would need," *id.* at 8, the two never discussed the details or circumstances of further deals.  Nor did they discuss any distribution by Garner, *id.* at 10, or Pacheco's supplier, *id.* at 18-19.  Indeed, Pacheco explicitly disclaimed any association with Garner's further sales, if there were any, or what Garner did with the drugs Pacheco sold him: "His business was his business, mine was mine. . . . I don't need to know what [Garner is] doing."  *Id.* at 50.  Pacheco specifically testified that he knew nothing about Garner's sales to Rosa Lopez until he saw the indictment and that whatever drugs Pacheco provided to Garner had "nothing to do with those sales."  *Id.* at 60.  Again, Pacheco believed "it's not [his] business."  *Id.* at 92.

That proof evidences three sales of cocaine but not any agreement to distribute it.  It demonstrates that Pacheco never "promote[d]" Garner's illegal venture himself, "ma[de] it his own," or had "a stake in its outcome."  *Parker*, 554 F.3d at 234 (quoting *Falcone*, 109 F.2d at 581).  Likewise, it offers no basis to infer that Garner was part of Pacheco's distribution scheme other than as a customer.

The factors addressed in a buyer-seller exception inquiry support this conclusion.  Far from having a longstanding relationship or prolonged cooperation, Pacheco and Garner did not know each other before their first transaction; they met by chance through Pacheco's cousin.  Docket Item 203 at 25-27.  Pacheco did not trust Garner,

6

Docket Item 204 at 21; wanted to see cash before he would give cocaine to Garner, *id.* at 22, 25-27; and never gave Garner cocaine on credit, *id.* at 21, 27. Their transactions were hardly standardized: the amount varied between the first and the second and third transactions, and the transactions were initiated ad hoc via text message, not planned at regular intervals. *Id.* at 19-20, 25. Although Pacheco said that he was "willing to supply" Garner, Docket Item 203 at 28; that he could get "whatever [Garner] would need," Docket Item 204 at 8; and that "if [Garner] needs any more, [he should] give [Pacheco] a call," *id.* at 9, those statements do not demonstrate anything more than a supplier-customer relationship.

Moreover, Pacheco's testimony demonstrates that he distributed drugs alone rather than as part of a conspiracy with Garner. When Pacheco visited Puerto Rico for two weeks in June 2016, his drug distribution business was "put on hold," and no one filled in for him. *Id.* at 18. Pacheco never asked Garner what he was going to do with the drugs, *id.* at 92; in fact, when Pacheco sold drugs to someone, he did not know whether his customer was a middleman or an end user, *id.* at 111. On the contrary, Pacheco testified that he did not use a "middleman" who would prevent him from "having to be in contact with who [he was] selling to." *Id.* He testified: "I don't know you're giving it to [someone else], all I know is I'm dealing with you." *Id.* Pacheco also never told his customers—including Garner—about the quantity of drugs he was receiving or how much he could supply them. *Id.* at 18-19. He simply met orders as they came in. *Id.*

Pacheco does not seem to have treated Garner differently from any other customer when it came to drug transactions. Pacheco had many other customers, *id.* at

7

62-66, and he sold the same or similar quantities to them, *id.* at 32, 62-66. He charged Garner the same prices. *Id.* at 21. In fact, Pacheco may have had a more distant relationship with Garner than with other customers. When Pacheco got a new phone number, for example, he gave the new number to other customers, but not to Garner. *Id.* at 91.

And Pacheco testified that he did not know why Garner gave $10,000 to Pacheco's girlfriend, Andrea Hatfield Sparks, after Pacheco was arrested. *Id.* at 47-48. Sparks testified that she had seen Garner only once before the day he first gave her money, Docket Item 205 at 15, and that she did not know why Garner was giving her money, *id.* at 9. She assumed it was to help take care of her kids, *id.* at 8, and that Garner was just a friend helping out, *id.* at 38. Even if Garner intended the money to help with Pacheco's bail or to encourage him not to cooperate—the inference most favorable to the government—that does not suggest a conspiracy; rather it simply suggests that Garner was doing something illegal with Pacheco—that is, purchasing drugs from him. And that is especially so because Pacheco did not know why Garner gave Sparks any money. So the episode does not suggest a conspiracy any more than it does a close distributor-customer relationship.

The government argues that the wholesale quantities Pacheco sold Garner on multiple occasions provided sufficient evidence for the jury to infer an agreement and convict Garner of a conspiracy. Docket Item 152 at 11. It argues that where "there is advanced planning among the alleged co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use . . . the participants in the transaction may be presumed to know that they are part of a broader conspiracy." *United States v.*

8

*Medina*, 944 F.2d 60, 65-66 (2d Cir. 1991); *see also United States v. McLeod*, 626 Fed. App'x 25, 26 (2d Cir. 2015) (summary order); *United States v. Howard*, 639 Fed. App'x 686, 690 (2d Cir. 2016) (summary order). In each case the government cites, however, the wholesale quantities were not the only evidence. *See, e.g.*, *Medina*, 944 F.2d at 62-63 (detailing co-conspirators' advanced planning of a drug transaction); *McLeod*, 626 Fed. App'x at 26 ("McLeod purchased crack cocaine . . . in wholesale quantities at wholesale prices at regular, frequent intervals[,] . . . he discussed the needs and complaints of his customers with his supplier, . . . [and] had a single, regular supplier . . . with whom he shared information about his own customers."); *Howard*, 629 Fed. App'x at 690 (in addition to buying wholesale quantities, there was evidence of a conspiracy "because [the co-conspirators] cooperated to transport quantities of cocaine from Atlanta for re-sale in Buffalo."). For that argument to carry the day here, on the other hand, quantity would have to be enough by itself.

But "[n]o single factor is dispositive," *Hawkins*, 547 F.3d at 74, and quantity alone is not enough. In fact, while a jury might infer that the buyer intended to resell drugs he purchased in wholesale quantities, that "does not necessarily establish that the buyer has joined the seller's distribution conspiracy." *Id.* Indeed, the "volume and frequency" of drug transactions alone is "insufficient" to support a conspiracy conviction when the "circumstances do not create the inference of mutual dependency." *Brock*, 789 F.3d at 65 (volume and frequency of drug transactions did not create an inference of conspiracy when the buyer was one of many regular customers and purchased for both personal use and resale). Moreover, even if Pacheco knew that Garner intended to resell the drugs, that knowledge alone would not be enough to show the requisite agreement.

9

*See Hawkins*, 547 F.3d at 74. And all that is especially so here, where the jury actually acquitted the defendant of all counts involving wholesale quantities and found that the alleged conspiracy involved just a few ounces of cocaine.

The Second Circuit's decision in *Brock* is instructive. In that case, the Court found that the volume and frequency of the transactions alone were "insufficient to move the . . . relationship beyond that of buyer-seller." 789 F.3d at 65. The court noted that the seller "had no interest in what [the buyer] did with the drugs" and saw the buyer "only as a customer." *Id.* The court observed that the buyer had other suppliers and that the seller had other customers. *Id.* And the court noted that the buyer had no connection to the seller or the larger enterprise from which the seller got his drugs other than as a customer. *Id.*

The same can be said of Pacheco and Garner here. In fact, while the buyer in *Brock* typically purchased regularly from the seller—"two eight-balls at a time, on several days each week, and occasionally more than once per day," 789 F.3d at 62—Garner purchased from Pacheco a total of only three times. And while the buyer in *Brock* had a regular practice of setting up transactions on a "'dispatch' phone," *id.*, the transactions here were ad hoc. In addition, the buyer in *Brock* "purchased and resold drugs in wholesale quantities on a regular basis" and "knew that [the seller] worked for [his supplier] and that the two were moving large quantities of drugs on a daily basis." *Id.* at 62-63. If that were not enough to sustain a conspiracy conviction on a Rule 29 motion, then the proof here—where the quantity of drugs is the *only* factor that might suggest a conspiracy—must be insufficient as well.

Here, there was no prolonged cooperation between the parties, no mutual trust, no sales on credit, and no standardized dealings. *See Hawkins*, 547 F.3d at 74. Here, there was no evidence that Garner sought to—or even wanted to—advance Pacheco's or his supplier's interest, or vice versa; no longstanding relationship between Garner and Pacheco; no other duties Garner performed for Pacheco or vice versa; no sharing of profits; and no "physical, financial, or other protection" provided to Garner by Pacheco or Pacheco's suppliers. *See Fatine*, 2016 WL 1700385, at *3. In short, there is no basis from which to infer a conspiracy other than the kilogram quantities that Pacheco testified he sold to Garner, testimony that the jury rejected by virtue of its verdict.[3] Even if those quantities are part of the calculus, they alone are not enough to infer a conspiracy in the Second Circuit. *See Brock, supra.*

The cases in which the Second Circuit has affirmed a conspiracy conviction involving a buyer and a seller all have had "significant indicia of a conspiratorial purpose [including] purchas[ing] drugs in significant quantities on credit[,] . . . facilitating resales, supplying bail money and recruiting other customers and sellers." *Brock*, 789 F.3d at 64; *see United States v. Rojas*, 617 F.3d 669, 672, 675–76 (2d Cir.2010) (seller testified that he had "longstanding" relationship with buyer, provided buyer with bail money because buyer "was moving product" for him, and sold drugs to buyer on credit because he knew that buyer would resell a portion of the drugs); *Parker*, 554 F.3d at 239 (unrebutted evidence that buyer recruited his roommate to help selling organization

---

[3] As noted above, the jury acquitted Garner of all substantive counts. Moreover, the jury explicitly found that the conspiracy involved less than 500 grams of cocaine, rejecting the opportunity to find between 500 grams and 5 kilograms or 5 kilograms or more. Docket Item 140.

11

"handle one of the drug-order phone lines" while buyer made deliveries for selling group, and that another buyer purchased crack on credit and facilitated resales of crack in smaller quantities than selling organization usually sold); *Hawkins*, 547 F.3d at 75 (testimony that buyer "repeatedly brought potential customers' needs" to seller's attention, and that he purchased drugs on credit with the understanding that he would resell the drugs and use profits to repay seller). Here, a fact-specific review of the trial testimony upon which the government relies, even viewed in the light most favorable to the government, demonstrates that a rational jury could not conclude that Garner and Pacheco conspired to distribute controlled substances. While the evidence showed that both Garner and Pacheco bought and sold drugs, that alone does not show that they agreed to do so together.

"To sustain a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004) (internal quotations omitted). The government did not do that here. And so the evidence was insufficient to convict Garner of conspiracy.

## **CONCLUSION**

For the reasons stated above, Garner's Rule 29 motion for a judgment of acquittal, Docket Item 148, is hereby GRANTED.

SO ORDERED.

Dated: May 29, 2019
Buffalo, New York

*s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE